**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>**MARIO RENE LOZANO**<br><br>Debtor. | Chapter 7<br>Case No. 18-11315-JEB |
| **HOMEOWNERS ASSISTANCE PROGRAM LLC and PILAR SANCHEZ**,<br><br>Plaintiffs,<br><br>v.<br><br>**GARY W. CRUICKSHANK, Chapter 7 Trustee, and MARIO RENE LOZANO,**<br><br>Defendants. | Adversary Proceeding<br>No. 19-01055-JEB |

**MEMORANDUM OF DECISION**

This matter came before the Court on the complaint by the plaintiffs, Homeowners Assistance Program, LLC and Pilar Sanchez, against the defendants, the debtor, Mario Lozano, and the Chapter 7 Trustee, Gary Cruickshank. In this proceeding, the Plaintiffs seek specific performance of a postpetition contract between Ms. Sanchez and Mr. Lozano to purchase property at 52-54 Bicknell Street, Dorchester, Massachusetts. Homeowners Assistance Program, LLC, ("Homeowners") as real estate broker for Mr. Lozano, seeks its commission upon the closing of the sale. For the reasons set forth below, the Court will grant judgment in favor of the Plaintiffs for specific performance of the agreement.

**Background**

Mr. Lozano commenced the bankruptcy case on April 12, 2018, under Chapter 7 of the

Code. Although originally filed as a Chapter 7, the case was converted to a Chapter 11 on July 17, 2018. On August 1, 2019, the bankruptcy case was reconverted to a case under Chapter 7 of the Code. Gary Cruickshank was appointed as Chapter 7 Trustee.

When the bankruptcy petition was filed, Mr. Lozano owned the property located at 52-54 Bicknell Street, Dorchester, MA ("Bicknell Property"). Mr. Lozano also owned property located at 70 Day Street, Jamaica Plain, MA ("Day Street Property"). In addition, he was involved in litigation in state court over ownership of property located at 35 Bradshaw Street, Dorchester, MA ("Bradshaw Property").

The Bicknell Property was subject to a mortgage held by Wells Fargo Bank, N.A. As of the filing, the amount due to Wells Fargo under the mortgage was approximately $728,000. Prior to the filing, Mr. Lozano and Wells Fargo were involved in litigation regarding the Bicknell Property. Mr. Lozano filed the bankruptcy because Wells Fargo had scheduled a foreclosure sale on the Bicknell Property.

When the mortgage was granted, the Bicknell Property was a single multifamily property with four units. In 2013, Mr. Lozano created a condominium under M.G.L. Chapter 183A and transferred the property to a condominium trust. Mr. Lozano did not sell any units and remains sole beneficiary of the condominium trust and owner of all four units.

At the time of the petition, Mr. Lozano did not live at the Bicknell Property. He lived at the Bradshaw Property under a use and occupancy agreement while eviction litigation was pending.

On May 11, 2018, Wells Fargo filed a motion ("Wells Fargo Motion") seeking relief from the automatic stay to foreclose on the Bicknell Property. Mr. Lozano opposed the Wells Fargo Motion. The Court held several hearings on the Wells Fargo Motion during the summer of

2018.

Mr. Lozano obtained approval on August 24, 2018, to engage Laura Sheedy and Homeowners to act as broker to sell his real estate for a five percent commission, payable upon the closing of a sale. In addition, Mr. Lozano obtained approval on August 23, 2018, to engage Alicia McNeil as real estate counsel.

On October 16, 2018, the Court held a continued hearing on the Wells Fargo Motion and entered an order requiring Mr. Lozano to make adequate protection payments to Wells Fargo. The hearing was continued to November 21, 2018. Shortly before the scheduled hearing, Wells Fargo filed a motion to continue the hearing for 30 days since they had received a payment. The hearing was continued twice to January 24, 2019.

On or about December 19, 2018, Mr. Lozano accepted an offer from Ms. Sanchez to purchase the Bicknell Property for $1,000,000. Mr. Lozano executed a purchase and sale agreement dated January 11, 2019, to sell the Bicknell Property to Ms. Sanchez.

The Purchase and Sale Agreement ("Agreement") included a standard form agreement ("Standard Form") and a rider A ("Rider") containing additional provisions. The Agreement provided that:

    a.    The sale was subject to bankruptcy court approval.

    b.    The purchase price was $1,000,000, with a deposit of $15,000.

    c.    Under Paragraph 20 of the Rider, Mr. Lozano agreed that "Prior to the Closing, Seller shall have submitted all documents to convert the Premises into legal multi-family status."

    d.    The property was to be delivered free of tenants and occupants.

    e.    Paragraph 26 of the Standard Form included a mortgage contingency clause, permitting the buyer, Ms. Sanchez, to terminate the Agreement if she was unable to obtain a mortgage by February 15, 2019.

    f.    Under Paragraph 8 of the Standard Form, the closing date was scheduled for

        12:00 P.M. on February 28, 2019.

g.     Under Paragraph 10 of the Standard Form, Mr. Lozano, as seller, could extend the closing by 30 days to clear title or be able to deliver possession.

h.     The Rider included additional provisions regarding the closing. Paragraph 1 of the Rider stated that Ms. Sanchez had obtained financing through Neighborhood Assistance Corporation of America ("NACA"). The parties agreed that the closing would be determined and governed by NACA regulations and guidelines. The closing would occur only when and if NACA had approved and cleared the premises for closing. In addition, the parties acknowledged that the closing date may have to be adjusted to accommodate NACA requirements. Mr. Lozano, as Seller, agreed to cooperate if an extension was required, provided the extension would not extend more than 14 working days beyond the agreed upon closing date.

i.     Although Paragraph 8 of the Standard Form provided that the closing would occur at the Suffolk County Registry of Deeds, Paragraph 19 of the Rider expressly overrode that provision and stated that the closing would occur at the NACA Boston office.

j.     In Paragraph 44 of the Standard Form, the parties agreed that their respective attorneys had full authority to extend the closing or financing contingency deadline.

k.     The agreement was to be construed as a Massachusetts contract.

Ms. McNeil was counsel to Mr. Lozano and Mr. Van Le was counsel to Ms. Sanchez. The Agreement stated that Laura Sheedy and Homeowners was the broker for Mr. Lozano as seller and that Andreia Da Silva and First Call Realty was the broker for Ms. Sanchez.

On January 15, 2019, Mr. Lozano filed a motion under Section 363 to sell the Bicknell Property to Ms. Sanchez pursuant to the Agreement. The Motion sought to sell the Bicknell Property free and clear of any liens, with the liens to attach to the proceeds. The Motion also included a request that that Mr. Lozano be authorized to take any actions "necessary, appropriate, or desirable to consummate the transactions provided for, or contemplated in, the Agreement." On January 17, 2019, the Notice of Sale for the Bicknell Property was filed, setting the hearing on the Sale Motion for February 20, 2019, with objections or counteroffers by

4

February 7, 2019.

On January 17, 2019, Mr. Lozano also filed a motion to sell the Day Street Property pursuant to an agreement dated January 4, 2019, for a sale price of $1,675,000. The motion stated that the liens on the Day Street Property were $322,000. The sale agreement for the Day Street Property contained no mortgage contingency and provided for a closing on February 13, 2019. On January 18, 2019, the notice of sale of the Day Street Property was filed. A hearing was scheduled for February 20, 2019, with objections due by February 12, 2019.

On January 22, 2019, Wells Fargo filed a motion to continue the January 24, 2019, hearing on the Wells Fargo Motion for 45 days, based on the Debtor's motion to sell the Bicknell Property. The hearing was continued to March 12, 2019.

On January 24, 2019, Wells Fargo filed a response to the motion to sell the Bicknell Property stating that it did not object provided that it was paid at closing in full and the closing occurred within 90 days.

The Court held hearings on the motion to sell the Bicknell Property on February 20, 2019, and February 25, 2019. The Court entered orders dated February 25, 2019, and February 26, 2019, (collectively "Sale Orders") granting the motion and approving the sale. The Sale Orders provided that all valid liens would attach to the proceeds, and the secured claim of Wells Fargo would be paid in full at the closing. The Sale Orders also directed the Debtor to close the transaction within 30 days.

The Court also entered orders approving the sale of the Day Street Property dated February 25, 2019, and February 26, 2019. The sale of the Day Street Property closed on March 13, 2019.

As previously discussed, the Agreement required Mr. Lozano to file documents to

5

convert the Bicknell Property from a condominium to a multifamily property. Ms. McNeil prepared a draft document ("Conversion Document") to convert the Bicknell Property back to a single multifamily property. As drafted, the Conversion Document required the assent of Wells Fargo, which held a lien on the Bicknell Property. On or about February 20, 2019, Ms. McNeil sent a draft Conversion Document to counsel for Wells Fargo, Keith McCarthy. The draft document did not include the recording information.

Wells Fargo signed the draft Conversion Document on February 25, 2019. Mr. McCarthy sent a copy of the draft document to Ms. McNeil by email. Ms. McNeil advised him that the document could not be recorded since it was in draft form.

Ms. McNeil prepared a final Conversion Document with the recording information. On February 27, 2019, Mr. Lozano signed the Conversion Document. About the same time, Ms. McNeil sent the final Conversion Document to Mr. McCarthy for Wells Fargo to sign.

During this period, Ms. Sanchez and Mr. Lozano, through counsel, agreed to extend the deadlines for Ms. Sanchez to obtain financing and for the closing to occur. The parties dispute the final dates that were agreed upon for Ms. Sanchez to exercise her rights under the financing contingency clause and for the closing date. Mr. Lozano and the Trustee take the position that the closing was scheduled for March 29, 2019. Ms. Sanchez and Homeowners take the position that March 29, 2019, was the deadline for Ms. Sanchez to exercise her right under the financing contingency and that April 5, 2019, was the agreed upon closing date.

On March 11, 2019, Wells Fargo filed a motion to continue the hearing on the Wells Fargo Motion scheduled for March 12, 2019, to permit the sale to close. The hearing was rescheduled to March 27, 2019.

On March 27, 2019, the Court held a hearing on the Wells Fargo Motion. At the hearing,

the parties advised the Court that the sale had not closed and that Wells Fargo had not signed and returned the final Conversion Document. Counsel for Wells Fargo reported that they were working on the document and hoped to have it signed shortly. The hearing on the Wells Fargo Motion was continued to May 1, 2019, to permit the sale to close.

On the same day, March 27, 2019, bankruptcy counsel for Mr. Lozano, William Parks, filed a motion to extend the deadline for Mr. Lozano to complete the closing of the sale. The motion was granted on March 27, 2019, extending the deadline for the sale to close to April 27, 2019.

The morning of March 27, 2019, at 10:19 a.m., Attorney Van Le, who was counsel to Ms. Sanchez and her lender for the closing, sent an email to Ms. McNeil. The email stated: "Hi Alicia, buyer cannot get a loan approval by 3/29 Friday due to the title still as condos. She will not extend further after Friday unless there is some realistic chance of this happening. Please advise. Thanks, Van." Ms. McNeil initially replied to Mr. Le's email at 6:20 p.m. on March 27, 2019, stating: "Sorry for the late reply, but I was not available today. I will follow up to your email tomorrow."

On Thursday, March 28, 2019, at 2:37 p.m., Mr. McCarthy sent an email to Ms. McNeil advising her that Wells Fargo had delivered the signed final Conversion Document to his office and inquiring about instructions. On Friday, March 29, 2019, at 7:10 a.m., Ms. McNeil replied to Mr. McCarthy requesting that the signed Conversion Document be forwarded to the address on her email: 15 Lincoln St., Suite 190, Wakefield. The address was not her physical office, but a facility where she received mail and packages.

Mr. McCarthy replied later that day that the Conversion Document was being sent by overnight delivery and provided a tracking number. The final Conversion Document executed by

7

Wells Fargo was delivered on Monday, April 1, 2019, at 9:38 a.m. to the address provided by Ms. McNeil.

On April 1, 2019, at 9:42 a.m., Ms. McNeil responded to Mr. Le's March 27 email and stated: "After careful consideration, Mr. Lozano had decided not to agree to an extension for the commitment letter, and therefore will not be moving forward with this deal. He is resolved to dealing with Wells Fargo and the property via the bankruptcy court."

In early April, Ms. Sanchez retained another attorney, Jenna Wolinetz, to represent her. Ms. Wolinetz sent emails on April 5, 2019, and April 6, 2019, to Mr. Parks, bankruptcy counsel to Mr. Lozano, and Paula Bachtell, counsel to the United States Trustee, regarding the closing. Neither Mr. Lozano nor his counsel agreed to a closing date and time. The sale did not close by April 27, 2019.

The Court held a hearing on May 1, 2019, on the Wells Fargo Motion and a subsequent affidavit of noncompliance filed by Wells Fargo alleging that Mr. Lozano had failed to make adequate protection payments. On May 7, 2019, the Court granted Wells Fargo relief from the automatic stay. After conversion of the case, on January 7, 2020, the Court granted a motion by the Trustee to pay the mortgage arrears to Wells Fargo and to reinstate the mortgage.

During April 2019, Mr. Lozano also reached an agreement regarding the Bradshaw Property with Endeavor High Yield Mortgage Fund LLC and Ricochet Real Estate LLC, who had been seeking to evict him from the property. During the bankruptcy, Endeavor and Ricochet obtained relief to continue the litigation. In a motion filed on April 26, 2019, Mr. Lozano sought approval of an agreement with Endeavor, Ricochet and other parties, including Allison Lozano, regarding the Bradshaw Property. (There was no statement regarding Allison Lozano's relationship to Mr. Lozano.) As part of that agreement, Mr. Lozano and Allison Lozano

8

confirmed that the eviction actions against them had proceeded to judgment, all appeals had been exhausted and executions had issued. Mr. Lozano and Allison Lozano agreed to vacate the Bradshaw Property by June 30, 2019, or the parties could move forward with the executions for possession.

Homeowners and Ms. Sanchez commenced this adversary proceeding on May 16, 2019. After the bankruptcy case was reconverted to a case under Chapter 7, the Court ordered that the Chapter 7 Trustee be named as a defendant in the adversary proceeding. Mr. Lozano was permitted to continue as a defendant to protect his interests, since the case has a potential for a surplus distribution.

In the Complaint, the Plaintiffs originally sought damages for the breach of the Agreement in addition to specific performance of the Agreement. In the Joint Pretrial Memorandum filed by the parties, the Plaintiffs sought only specific performance of the Agreement. Pursuant to orders of the Court, the Joint Pretrial Memorandum superseded the pleadings, to the extent inconsistent.

The Court held a two-and-a-half-day trial by video. In addition to the testimony of the witnesses at trial and the exhibits submitted by the parties, the Court took judicial notice of the pleadings and record of the bankruptcy case and the record of this adversary proceeding.

The Plaintiffs assert that the buyer, Ms. Sanchez, is ready willing and able to perform, but that the Debtor, Mr. Lozano, breached his obligations under the contract and failed to close. Mr. Lozano and the Trustee allege that Ms. Sanchez terminated the contract and Mr. Lozano was not obligated to perform. The Trustee also alleges that Ms. Sanchez failed to demonstrate she was ready, willing and able to close on the sale.

9

**Analysis**

Having considered the testimony, the exhibits, and the record of the proceedings, the Court makes the following findings of fact and conclusions of law.

The Court finds that the Plaintiffs are entitled to specific performance of the Agreement. Under Massachusetts law, specific performance is an appropriate equitable remedy for breach of contract to purchase real property given the unique nature of interests in land. *Greenfield Country Ests. Tenants Ass'n., Inc. v. Deep*, 423 Mass. 81, 88, 666 N.E.2d 988, 993 (1996). As a general rule, the buyer must demonstrate that they are ready, willing and able to perform the contract. *Leigh v. Rule*, 331 Mass. 664, 668, 121 N.E.2d 854, 857 (1954). But the law does not require "useless ceremonies." *Id*. at 669, at 857. Where the seller refuses to perform his obligations under the contract, tender of performance is not required. *Coviello v. Richardson*, 76 Mass. App. Ct. 603, 609–10, 924 N.E.2d 761, 766–67 (2010). As more fully discussed below, the Court finds that Ms. Sanchez was ready, willing and able to close once Mr. Lozano performed his obligations under the Agreement.

The Court finds that Mr. Lozano breached his obligations under the Agreement, preventing Ms. Sanchez from closing, including his obligation to act in good faith under the Agreement. There is an implied covenant of good faith and fair dealing in every Massachusetts contract. *Robert & Ardis James Found. v. Meyers*, 474 Mass. 181, 188, 48 N.E.3d 442, 449 (2016). This means that a party cannot take actions to destroy the rights of the other party to the benefit of the contract. *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471–72, 583 N.E.2d 806, 820 (1991). As more fully discussed below, Mr. Lozano breached his obligations by failing to reconvert the Bicknell Property to a single multifamily property, by failing to agree to a closing and by intentionally having Ms. McNeil fail to disclose the Conversion Document.

The Court finds that Mr. Lozano voluntarily signed the Agreement and is bound by its terms. This included his obligation to convert the Bicknell Property from condominiums to a single multifamily property. Although Mr. Lozano testified that he signed the Agreement under duress because of the pending Wells Fargo Motion, the Court does not find the testimony credible.

a. Mr. Lozano could have continued making adequate protection payments pending further sale efforts. He did not.

b. Mr. Lozano signed the agreement to sell the Day Street Property on January 4, 2019, prior to executing the Agreement. Mr. Lozano could have proposed a plan to use the proceeds of the Day Street Property to pay Wells Fargo instead of proceeding with the Agreement. He did not.

c. Mr. Lozano did take steps to sell the Bicknell Property and perform the Agreement. In the fall of 2018, Mr. Lozano engaged Mr. Ricardo Martinez to perform repairs, paint, and clear out the basement. Mr. Lozano obtained the fire inspection on March 19, 2019. He also testified credibly to the steps taken to comply with other provisions of the Agreement.

The Court finds that the parties mutually agreed to a deadline of March 29, 2019, for Ms. Sanchez to terminate the Agreement under the mortgage contingency clause and to a closing date of April 5, 2019. The Court finds that the parties agreed to the extensions to enable Mr. Lozano to record documents to convert the Bicknell Property to a single multifamily property.

a. Under the Agreement, Mr. Lozano was required to record all documents to convert the property from condominiums to a single multifamily property.

b. After the Agreement was executed, when dealing with extensions of time, the parties agreed upon the extensions of two dates: the date in the mortgage contingency clause and the closing date.

c. Ms. McNeil, an experienced real estate counsel, understood that the conversion would require additional delays affecting both the financing contingency and the closing. In an email exchange on January 28, 2019, with Mr. Parks, Ms. McNeil explained that additional time would be needed after the conversion for the lender to appraise the property as a single property instead of condominiums, before giving final approval to the loan.

d. Attorney Van Le sent an email on Friday, March 22, 2019, at 4:33 p.m. requesting

11

       the extension of the deadline to March 29, 2019, for the financing contingency and April 5, 2019, for the closing. The next business day, on Monday, March 25, 2019, at 11:40 a.m., Ms. McNeil sent an email to Mr. Le that her client agreed to the extension.

    e.    The Court does not find credible Ms. McNeil's testimony that her March 25 email was a response to a different extension request. Ms. McNeil did not identify the alleged other extension request. She also did not explain why there would be two different date extension requests at the same time.

    f.    Ms. McNeil's response the next business day was consistent with her course of dealing. Mr. Le testified credibly that Ms. McNeil was usually prompt in her responses. The prior emails sent by Ms. McNeil in the record showed that Ms. McNeil usually responded within a business day to emails.

    g.    The responses to Ms. McNeil's March 25 email also support the finding that the parties agreed to extend the two dates as proposed in Mr. Le's March 22 email. In Ms. McNeil's email, in addition to agreeing to the extension, she inquired whether the buyer was ready to perform. Mr. Le sent an email in reply explaining that after the Conversion Document was submitted a title examination would be required. The buyer's broker, Andreia Da Silva, also sent an email stating that the loan was ready to go, except for the conversion of the Bicknell Property from condominiums.

    h.    Although Ms. McNeil and Mr. Lozano claimed the closing was on March 29, 2019, they took no steps to prepare for a closing on March 29, 2019. Ms. McNeil made no effort to have the Conversion Document expedited to her office and recorded. Mr. Lozano made no effort to ensure the Bicknell Property was free of occupants.

    i.    Ms. McNeil's subsequent emails also are consistent with the finding that the parties had extended the financing contingency to March 29, 2019. Mr. Le's March 27 email did not refer to closing on March 29, but instead referred to an inability to obtain loan approval by that date because the Bicknell Property remained as condominiums. In her response on April 1, 2019, Ms. McNeil did not state that the closing date had passed, or that her client would not agree to extend the closing date. Instead, she stated that her client would not agree to an extension for the "commitment letter."

The Court finds that Ms. Sanchez did not terminate the Agreement by Mr. Le's March 27 email. The Court finds that Mr. Lozano's claims to the contrary were only crafted later to avoid the consequences of Mr. Lozano's breach of the Agreement.

    a.    Mr. Le's March 27, 2019, email expressly sought further information as to the status asking for Ms. McNeil to "Please advise." The March 27 email did not state

12

        that the Agreement was terminated and did not demand the return of the deposit.

    b.    Mr. Le testified credibly at trial that the email was not intended to terminate the Agreement.

    c.    Neither Mr. Lozano nor his counsel advised any of the parties immediately that their position was the Agreement was terminated by Mr. Le's email. Instead, they waited several weeks, making the argument only after Ms. Sanchez continued to pursue the sale.

    d.    In her April 1, 2019, email in response, Ms. McNeil did not state that the Agreement was terminated by the March 27 email or that it was her position the closing date had passed. Instead, she stated that Mr. Lozano would not agree to extend the deadline for Ms. Sanchez to obtain the loan commitment.

    e.    In an email exchange on April 2, 2019, when Mr. Le contended that Mr. Lozano was required to extend the closing date, Ms. McNeil did not reply that the Agreement was terminated. She instead stated that her limited information was that her client would not agree to an extension.

    f.    Ms. Sanchez and her counsel continued to actively pursue the sale.

    g.    Counsel for Mr. Lozano continued to move forward for a closing. On April 5, 2019, Ms. McNeil requested a new payoff from Wells Fargo and stated that she had the approval.

    h.    In her emails dated April 5, 2019, and April 6, 2019, Ms. Wolinetz, as attorney for Ms. Sanchez specifically asked about the status of the closing scheduled for April 5, 2019. Neither Mr. Parks nor Ms. McNeil responded that the Agreement was terminated or disputed that the closing date was April 5, 2019.

The Court finds that Ms. Sanchez was ready, willing and able to close the sale under the Agreement once Mr. Lozano performed his obligations under the Agreement.

    a.    Both Mr. Le and the buyer's broker, Ms. DaSilva, confirmed in their emails on March 25 that Ms. Sanchez was ready to close, except for the issues regarding the conversion of the Bicknell Property from condominiums.

    b.    Ms. Sanchez continued to pursue the sale and seek a closing date, as reflected by numerous emails during March 2019 and April 2019.

    c.    Ms. Sanchez testified credibly at trial that she was ready, willing and able to close under the Agreement. She testified credibly that she was qualified for the financing and that the financing commitment was in place, subject to the conversion of the Bicknell Property from condominiums.

    d.    Mr. Le testified credibly at trial that the closing could have occurred within

13

several days once the Conversion Document was recorded. He testified credibly that final approval was delayed solely because Mr. Lozano had not filed the documents to convert the Bicknell Property to a single multifamily property.

The Court finds that Mr. Lozano breached his obligation under the Agreement to reconvert the Bicknell Property from condominiums to a single multifamily property.

    a.    Under the Agreement, Mr. Lozano agreed to file documents to convert the Bicknell Property from condominiums to a multifamily property before the closing. Although the Agreement was executed on January 11, 2019, Ms. McNeil delayed more than five weeks before preparing the Conversion Document or discussing the issue with Wells Fargo.

    b.    The Trustee and Mr. Lozano failed to show that Wells Fargo caused Mr. Lozano to breach the Agreement. Wells Fargo signed the Conversion Document and advised counsel to Mr. Lozano that it was ready on March 28, 2019. Mr. Lozano still could have proceeded with the closing if his counsel had acted promptly to obtain and record the document. Mr. Lozano did not.

    c.    Mr. Lozano failed to show that the consent of Wells Fargo was required. The Sale Orders authorized the sale of the Bicknell Property free and clear of liens, including the lien of Wells Fargo. To the extent there was a concern that the Sale Orders were insufficient to authorize the conversion of the Bicknell Property without the consent of Wells Fargo, Mr. Lozano could have sought a further order of the Court. He took no steps to do so.

    d.    Mr. Lozano also failed to pursue other options under Massachusetts law to convert the Bicknell Property to a single multifamily property without requiring the consent of a lienholder.

    e.    Although the Conversion Document was fully executed, Mr. Lozano never had it recorded to fulfill his obligation to reconvert the Bicknell Property to a single multifamily property.

The Court finds that Mr. Lozano breached his obligation to act in good faith under the Agreement by intentionally having Ms. McNeil delay her response to Mr. Le's March 27 email. Mr. Lozano caused the intentional delay until after the March 29, 2019, deadline for the financing contingency because he believed that would result in Ms. Sanchez terminating the Agreement.

The Court finds that Ms. McNeil delayed responding to Mr. Le or disclosing the signed

14

Conversion Document to Mr. Le until she received instructions from Mr. Lozano. Although counsel for Wells Fargo informed Ms. McNeil that he had the signed Conversion Document on March 28, 2019, Ms. McNeil never informed Mr. Le that the document had been signed. Despite telling Mr. Le on March 27, 2019, that she would reply the next day, March 28, Ms. McNeil never replied further until April 1, 2019. Mr. Lozano testified that he waited until Ms. McNeil had verified the package had arrived on April 1 before he "gave the green light" to notify the parties he was not going forward with the Agreement.

The Court does not find Ms. McNeil's testimony credible that she delayed advising Mr. Le because she did not trust Wells Fargo. Ms. McNeil previously responded regularly and promptly to inquiries about the status of the conversion, even when she had little information, as reflected by her prior email communications. Mr. Le also testified credibly that Ms. McNeil typically responded promptly. Ms. McNeil could have asked for an emailed copy of the signed Conversion Document to confirm any issues, but she did not.

Mr. Lozano also breached his obligation to act in good faith under the Agreement by failing to agree to a closing date and time. Under the Agreement, Mr. Lozano was required to extend the closing date if needed by 14 working days to comply with any requirements of NACA or the lender. Despite his obligation to do so, as reflected in the exhibits and testimony, Mr. Lozano would not agree to a closing date. Contrary to Mr. Lozano's assertion, the closing date had not been previously extended at Ms. Sanchez's request. Instead, the closing date was extended by mutual agreement since Mr. Lozano had failed to fulfill his obligation to convert the Bicknell Property from condominiums to a single multifamily property.

The Court finds that Mr. Lozano breached the Agreement because he changed his mind about selling the Bicknell Property. Although he testified to several reasons for changing his

15

mind, none of them gave Mr. Lozano the legal right to terminate or breach the Agreement.

The Court finds that Mr. Lozano changed his mind in part to permit him and family members to move into the Bicknell Property. But the Agreement did not contain an option for Mr. Lozano to terminate the Agreement if he needed a residence. To the contrary, under the Agreement, Mr. Lozano was required to deliver the Bicknell Property free of all tenants and occupants. Instead of performing his obligation under the Agreement, Mr. Lozano decided to move family members to the Bicknell Property.

 a. As reflected in his agreement with Endeavor and Ricochet. Mr. Lozano was facing eviction from the Bradshaw Property in March 2019 and April 2019. He agreed to vacate the Bradshaw Property by June 30, 2019, and needed a new place to live.

 b. Instead of clearing the Bicknell Property of occupants, Mr. Lozano caused other family members to also move to the Bicknell Property. The Schedules filed in August 2018 listed the only tenant at the Bicknell Property as Ms. Mia Williams, the mother of his children. Ms. Sanchez testified credibly that there was only one occupied unit at the time she signed the Agreement. But Mr. Lozano testified at trial that he, his daughter and granddaughters were now living at the Bicknell Property, in addition to his son and his son's mother.

The Court finds that Mr. Lozano also decided not to proceed with the Agreement because he concluded that he could pay Wells Fargo from the sale proceeds for the Day Street Property. But the Agreement was independent of any agreement for the Day Street Property and did not provide an option for Mr. Lozano to terminate. Mr. Lozano completed the sale of Day Street property on or about March 13, 2019. He testified that he was "relieved" that he had sold Day Street Property because he had an alternative to pay Wells Fargo. He testified that he believed the proceeds of the Day Street Property were sufficient to pay his other debts, including Wells Fargo. In a pleading filed on April 25, 2019, opposing Wells Fargo's request for relief from the automatic stay, Mr. Lozano outlined his plan to use the sale proceeds for the Day Street Property to pay Wells Fargo.

16

The Court finds that Mr. Lozano also decided not to proceed with the sale because he believed that the Bicknell Property had increased in value. But, as with his other reasons, Mr. Lozano did not have the option to terminate the Agreement because he thought he could get a better price. The Agreement had already been subject to the opportunity for a higher bidder as part of the bankruptcy approval process. No higher offers were received.

Ms. Sanchez demonstrated that she was ready, willing and able to close once Mr. Lozano performed his obligation to convert the property to condominiums. Ms. Sanchez was not required to perform the "useless ceremony" of appearing at a closing, given Mr. Lozano's breaches of the Agreement and his refusal to discuss or schedule a closing.

Specific performance is an equitable remedy. The Plaintiffs should not be precluded from their rights under the Agreement because of the refusal of Mr. Lozano to perform his obligations under the Agreement or the delays caused between the trial and the issuance of this ruling. Accordingly, the Court will provide in the judgment that the deadline for Ms. Sanchez to terminate due to financing contingency will be extended to 60 days from the date of the judgment, and the closing date will be extended to 90 days from the date of the judgment. The judgment will provide for the payment of a commission to Homeowners upon the closing of the sale.

Although Mr. Lozano was permitted to participate as a nominal defendant, the Trustee is the only person authorized under the Code to act with respect to property of the estate, including the Bicknell Property. Accordingly, the judgment will enter against the Trustee and require the Trustee perform the obligations under the Agreement.

**Conclusion**

For the foregoing reasons, the Court will enter a separate judgment in favor of the Plaintiffs consistent with this decision.

Dated: December 29, 2022

By the Court,

Janet E. Bostwick
United States Bankruptcy Judge